**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 15, 2024**

# In the Court of Appeals of Georgia

A23A1492. IN THE INTEREST OF D. C. S. et al., children.

PIPKIN, Judge.

We granted the Mother's application for discretionary appeal to review her claim that the evidence was insufficient to support the juvenile court's order terminating her parental rights to her children D. C. S. and E. A. S. As more fully set forth below, we now affirm.

The record shows that D. C. S. was born September 5, 2014, and E. A. S. was born May 30, 2019. The children, both males, were removed from the Mother's custody in March 2021 after reports of physical abuse and neglect, which included hitting D. C. S. in the face and making his nose bleed and leaving E. A. S. in a playpen all day while she slept after working at night. The local Department of Family and

Children Services ("DFCS") filed a dependency action in juvenile court, and, following a hearing, the juvenile court entered an adjudication of dependency on April 9, 2021. DFCS was granted temporary custody of the children, and when no suitable relatives could be found, the children were placed in foster care with non-relatives.

The juvenile court held a hearing on April 14, 2021 on the continued dependency of the children and the implementation of a reunification case plan for the Mother. The juvenile court entered an order of disposition on May 6, 2021, approving a concurrent reunification and adoption plan. Pursuant to the case plan, the Mother was required to complete a number of goals, including that she maintain clean and stable housing; remain drug and alcohol free as demonstrated by six consecutive months of negative drug screens; complete parenting classes; complete a psychological evaluation and follow any recommendations resulting from the evaluation, which might include various types of counseling or therapy; complete anger management counseling; maintain regular employment; support the children as required by law; maintain regular visitation with the children; and maintain contact with DFCS.

Although the Mother made some progress on completing her case plan, she was unable to regain custody of the children, and they continued to live in foster care. In November 2022, DFCS filed a Petition for Termination of Parental rights against the Mother and putative fathers of the children, neither of whom had previous contact with the children. A hearing was held on the petition on February 21, 2023. Following the hearing, the juvenile court terminated the parental rights of the Mother and the putative fathers, and the Mother filed an application for discretionary appeal.[1] We granted the Mother's application, and this appeal followed.

1. The Mother's sole contention on appeal is that the evidence was insufficient to support the termination of her parental rights. We start with our standard of review.

> On appeal from an order terminating parental rights, we review the evidence in the light most favorable to the juvenile court's judgment in order to determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. We neither weigh evidence nor determine witness credibility, but defer to the juvenile court's findings of fact and affirm unless the appellate standard is not met.

---

[1] The putative fathers did not attend the termination hearing and did not seek to appeal the termination of their parental rights. Accordingly, we do not address any issues relating to the fathers in this appeal.

*In the Interest of E. M.*, 347 Ga. App. 351, 354 (2) (819 SE2d 505) (2018). However, "this deferential standard of review is tempered by the fact that there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously." (Citation and punctuation omitted.) *In the Interest of D. M.*, 339 Ga. App. 46, 46 (793 SE2d 422) (2016).

(a) *Factual Background.* Viewed in the appropriate light, the evidence shows the following. The Mother has three children – the two children at issue here and an older male child, M. R. S., who was born in April 2011, while the Mother was married to Franklin Shelley. Franklin testified that the Mother and he married in 2010 and at that time they were living in Washington State where he was stationed with the Navy. He said they continued to live in Washington State after M. R. S. was born in 2011, but in January 2013, he was transferred to Kings Bay, Georgia. He said the Mother and M. R. S. remained in Washington State until July 2013, when he received a call that the Mother had been arrested and that M. R. S. had been taken into protective custody. Franklin testified that he traveled to Washington State and brought M. R. S. back with him and that M. R. S. never lived with his Mother again after Franklin brought him

back to Georgia. Franklin and the Mother divorced in June 2014, and he was granted full legal and physical custody of M. R. S. Franklin also testified that the Mother was held in contempt several times for failure to pay court-ordered child support, and that, when he married Eileen Shelley in September 2016, the Mother's parental rights to M. R. S. were terminated so Eileen could adopt the child.

Before her divorce from Franklin was final, the Mother became pregnant by another man with D. C. S. The Mother testified that she suffered from postpartum depression after the birth and that she was working two jobs, so she placed D. C. S. in the care of her sister for several months. The Mother testified that D. C. S. also lived with a babysitter and the sitter's husband for a period of time in 2015 and 2016;[2] she said she could not remember how she found this babysitter or how long she had known the couple before she left D. C. S. in their care.

Eileen Shelley testified that she and Franklin would sometimes help the Mother out by babysitting D. C. S. but that they lost contact with the Mother and D. C. S. in early 2016. Eileen said that sometime later that year, they were contacted by Linda and

---

[2] The Mother testified that one reason she allowed others to care for D. C. S. was that she was trying to protect him if she got jailed for non-payment of child support for M. R. S.

Ashley Reeves,[3] who said that D. C. S. was living with them, and that they were hoping to re-establish a relationship with Franklin and Eileen so he could see his half brother, M. R. S.; they also said they were looking for support and someone to lean on if they had questions. Eileen testified that Franklin and she subsequently developed a "great" relationship with the Reeveses and that they frequently got together so that D. C. S. and M. R. S. could play together. This continued until around March 2017, when the Reeveses, who had been granted a temporary guardianship of D. C. S. in June 2016,[4] asked if Eileen and Franklin could take care of D. C. S. because the Reeveses were moving out of state for a job offer and were unsure if they could take D. C. S. across state lines.

---

[3] Apparently, the first babysitter said that D. C. S. became too much to care for and returned him to the Mother, who then found the Reeveses to care for him.

[4] The Mother testified that she consented to the guardianship because she thought it was in D. C. S.'s best interest due to her postpartum depression and fear of going to jail over not paying child support for M. R. S. Eileen testified, and the record shows, that the Reeveses attempted to transfer the guardianship to Franklin and Eileen when D. C. S. came to live with them, but those efforts were unsuccessful and that the Reeveses gave them a power of attorney instead. The guardianship that had been granted to the Reeveses was not dissolved until October 2020, when D. C. S. was returned to the Mother's care.

D. C. S. came to live with Eileen and Franklin in March or April 2017, and he stayed with them until October 2019. Eileen said that at first, it was a very positive situation where D. C. S. was fully integrated into the family, which included a new baby as well as M. R. S. The record shows the Mother did visit with D. C. S., but did so on an infrequent basis. And Eileen testified that, during those visits, the Mother sometimes became confrontational, which Eileen said she was not equipped to handle, especially when Franklin was deployed and she had three children to care for by herself. Both Franklin and Eileen testified that the Mother never contributed toward D. C. S.'s support and that she never paid the arrearage for her court-ordered child support for M. R. S.

Eileen testified that in the spring of 2019, D. C. S. became "quite irritable, quite argumentative." She said that she did not find this extremely concerning at first but, by the fall, he also had become aggressive and violent on occasion to both her and the other children, and he would scream so much at bedtime that the other children could not sleep. She said that Franklin was deployed during this time so she reached out to the Reeveses for help, and they agreed to take D. C. S. to Florida to live with them. D. C. S. moved to Florida to live with the Reeveses in October 2019, but he also became

violent and aggressive with them, and, when they could not get assistance dealing with his behaviors from the school and or other authorities, they contacted the Mother and made arrangements for her to come get him. In October 2020, the guardianship was terminated by consent, and D. C. S. returned to live with the Mother.

The Mother acknowledged that she did not pay any support for D. C. S. to either the babysitters or her ex-husband during the four year period he was living with either the Reeveses or her ex-husband; she further acknowledged that she had not kept in touch with D. C. S. – or had even known where he was – while he was with the Reeveses in Florida.[5] The Mother said that when D. C. S. came to live with her in October 2020, she and E. A. S., who was approximately 16 months old, were living at the babysitter's house where she was renting a room; prior to that, she and E. A. S. had lived in a hotel. She also said that after he came to live with them, D. C. S. became aggressive and threatening toward her and E. A. S. and that he went into the hospital for several days because of his behavior and was placed on various medications.

---

[5] It appears that prior to this time, the Mother tried to dissolve the guardianship but the court did not act on her request. Although the Mother's testimony about why this never happened was somewhat disjointed, she acknowledged that her efforts were not continuous and that there were times she did not attempt to have D. C. S. returned to her because she was not sure what was best for him.

In March 2021, DFCS received a report that the Mother, who worked nights and slept during the day, was, among other things, leaving E. A. S. in a wet diaper for long periods of time, leaving him in his playpen to cry while she slept during the day, leaving physical marks on D. C. S. from disciplining him, and had, on one occasion, given him a bloody nose; the Mother was also abusing prescribed Adderall or trading it for other drugs.[6] After initially being placed with "fictive kin" – the babysitter with whom she was living – for a short period, the children went to live at the foster home where they remained at the time of the termination hearing almost two years later. Despite the Mother's denial of the allegations of abuse and neglect that caused the children to be placed in foster care, the foster father testified that both boys were malnourished when they came to live with the foster family and that E. A. S. was developmentally behind, including delayed speech and an inability to play on his own. E. A. S. began to work with speech therapists and, by the time of the termination hearing, his speech was normal. The foster father also said that E. A. S., who was approaching four years old at the time of the hearing, had recently started playing on

[6] When, the day after the complaint was received, a DFCS worker returned for a scheduled assessment with the Mother, law enforcement had to be called due to the Mother's aggressive and uncooperative behavior. When the worker returned several days later, she observed E. A. S. screaming in his playpen while the Mother slept.

9

his own and that he had recently been potty trained. The foster father described E. A. S.'s progress over the last five or six months as phenomenal.

The foster father also testified about D. C. S.'s behavior when he first came to live with the foster family. He said that at first they observed the behaviors others had witnessed, such as screaming and yelling at bedtime and, also, that D. C. S. became very attached to things and was overly possessive. The foster father said that these behaviors abated over time but that the negative behaviors would increase around the time of scheduled visitation with the Mother. He testified that in the spring of 2022, D. C. S., who had not been violent before, became physically violent toward E. A. S. on the day of a scheduled visitation, and they later found out that he was upset because the Mother was showing favoritism toward E. A. S. during the visits. He said that D. C. S. also started wetting himself after the Mother told him that, if she regained custody, he would be moving and changing schools. The foster father testified that he believed D. C. S. became upset by this, especially because he had developed a consistent and safe relationship with one of his teachers. The foster father also testified that D. C. S. quickly returned to normal behavior after the visits with his

Mother were over[7] and that he took a noticeable turn for the positive in late December 2022 or early January 2023, when he was told by his counselor that he might not ever have to go home to his Mother. The foster father described D. C. S. as more relaxed, confident, and at ease since that time, and that while he had already started referring to the foster parents' children as "brothers" and sometimes referred to the foster father as "Dad," after he was told that he might not have to go back to the Mother, he also started calling his foster mother "Mom."

D. C. S.'s therapist also testified. She said that she had been providing once-a-week counseling to D. C. S. since September 2022 and that he had described his previous living situations to her. He told her that he knew neither of the Reeveses was his mother but that he did not know who his mother was and did not know his relationship to the Reeveses. D. C. S. reported to the therapist that he had been under the impression he would stay with the Reeveses indefinitely, but then his Mother came and picked him up, although he said he did not know the person that picked him up was his Mother until she told him several days later. He also told the therapist he

---

[7] A psychological assessment conducted in December 2022 recommended that consideration be given to discontinuing visitation if the visits continued to upset D. C. S.

was given a bag and had to choose what to take with him, and that he did not like it and it made him sad. D. C. S. also told the therapist about living with M. R. S., and he said that he did not like suddenly leaving his brother and did not like that he never got to see his brother again.

The therapist testified that D. C. S. worries a lot and has a lot of anxiety related to the Mother, going home, and, in general, his uncertain situation. She also said that he is very possessive of his things and that he had developed hoarding behaviors, which she said is consistent with children who have been in foster care and are insecure about their sense of place. The therapist testified that D. C. S. has some attachment to his Mother and gets excited to see her, but that he also has trepidation surrounding the visits because he is fearful that she will not show up. She questioned whether the bond D. C. S. says he has with his mother is meaningful since it is based only on short, structured visits, and the Mother had not, in her opinion, demonstrated her ability to be a caregiver and provide an emotionally stable place for D. C. S. outside of the structured visitations. She also said that, outside of the visits, D. C. S. could only describe his Mother as someone who was upset, yelled, was stressed out, and who spanked E. A. S. She said that although D. C. S. had expressed anxiety over

not going home with his Mother, she believed this might be related to his fear that his foster care situation might not be permanent, and that the only reason he could give her for wanting to live with his Mother was that she was "mom." The therapist said that D. C. S. likes living with the foster parents and that he knows he can go to them to talk when he is upset. She also said it was her understanding that the foster parents were willing to adopt both D. C. S. and E. A. S.

Testimony and written reports concerning the Mother's visits with the children were also introduced at the hearing. This evidence showed that the Mother had attended the majority of the visits but that the visitation had to be suspended between May 23, 2022 and July 13, 2022 because the Mother started cursing and yelling at the staff after they had to intervene during a visit. A worker at the visitation center who helped monitor the visits testified that some visits were "good" but that at other times there was tension between the Mother and D. C. S., especially during the initial visits when redirection often had to be provided to the Mother because of the favoritism she showed toward E. A. S., which upset D. C. S. She said the Mother was also habitually late, which resulted in the Mother being informed that the children would not be brought to the visitation center until she arrived because her tardiness caused D. C.

S. to become anxious. After the Mother was allowed to resume visitation, the Mother's negative behaviors improved, and the incidents that did occur were handled. A summary of the Mother's interactions with the children showed that while she put thought into the activities she brought them to work on, she was more affectionate toward E. A. S. and her interactions with D. C. S. mostly consisted of playing games; she did, however, tell D. C. S. that she loved him.

A DFCS caseworker who was assigned to the case from November 2021 to November 2022 testified about the Mother's progress on her case plan. She testified that the Mother had undergone a psychological examination,[8] a comprehensive child and family assessment, participated in parenting classes, visited with the children, and maintained employment, but that she was behind on her child support, had not completed anger management counseling, had been discharged from counseling due to lack of progress, and had not obtained stable housing. The caseworker testified that DFCS had discontinued the Mother's counseling after eight sessions due to lack of trust between the counselor and the Mother, the Mother's sporadic attendance, lack of progress, and the Mother's stated intent to use her own insurance to find a

---

[8] The Mother was diagnosed with generalized anxiety disorder, posttraumatic stress disorder, adult sexual abuse, and adult psychological abuse.

counselor she could trust. It was brought to the juvenile court's attention that for a period of time DFCS mistakenly indicated at several progress hearings that the Mother was compliant with the counseling requirement when, in fact, DFCS had ended the counseling due to lack of progress; the court noted on the record that those mistakes had been corrected and the most recent permanency order reflected that the Mother was non-compliant with counseling. Further, the record reflected that, during the counseling sessions she did attend, the Mother squandered most of her time complaining, especially about DFCS taking her children, instead of acknowledging and addressing the issues that caused her to lose custody.

The caseworker also elaborated on the Mother's lack of stable housing. She explained that, for the majority of the time the Mother had been working her case plan, she had been "couch surfing" or living out of her car. The Mother admitted that she had primarily lived in her car throughout most of time she had been working her case plan but she said that about three weeks before the hearing she had signed a one-year lease on a two-bed, two-bath apartment. The Mother testified that although her income is now stable, there was a period of time when she was out of work and receiving workers' compensation benefits; she explained that it was the decrease in

income, as well as a low credit score, which hurt her ability to find housing. Although the Mother said she looked for suitable housing the entire time the children had been in foster care, it appeared that most of that effort consisted of making lists of apartments in the area and calling to inquire about openings, and that the only proof she introduced of actually submitting applications was dated after the petition to terminate her parental rights was filed. She also admitted that, at the time of the hearing, the only furniture she had in the apartment was a bed for her to sleep in, although she maintained that she had other, unspecified furniture in storage and was trying to get it moved to the apartment.

Also related to the housing issue, a DFCS caseworker testified about her interactions with the Mother when she went to the newly acquired apartment to verify the Mother was living there. Accordingly to the witness, when she told the Mother she was there to verify her address, the Mother told her that she was on her way to visit her children, and before the caseworker could say anything more, the Mother

turned her back and shut[9] the door in her face. The caseworker testified that, even though she was not there to do a home study, she assumed the Mother knew she needed to come inside to verify the Mother was actually living at the apartment because otherwise the Mother's comment that she did not have time made no sense.

The Mother also testified about her work schedule. She said that she still works four days a week from 6:30 p.m. until 5:00 a.m. but that she was applying to different positions that she hoped would move her to the day shift. She also said that if the children were returned to her, she would have to find a babysitter, and that she had identified two possible babysitters and had their contact information in her phone; she could not, however, remember their names and did not know if they were still available.

The Mother also testified about the issues with counseling. She admitted there were scheduling issues, and she said these were primarily because she was also going to physical therapy for a work-related injury. She admitted that her relationship with

---

[9] The witness vacillated about whether the Mother closed or slammed the door in her face and demonstrated the Mother's actions during the hearing. While we do not have the benefit of this visual demonstration, the juvenile court did, and made a finding in the termination order that the Mother would not allow entry into the apartment.

the counselor was rocky at first but she thought their relationship had improved by the end. She said that until late November 2022, she was under the impression that she had completed the counseling requirement, and she said that she was trying to find her own therapist but had encountered obstacles with her insurance and where they wanted her to go, which she explained was not convenient for her. The Mother said that she was willing to go back to counseling to help her get her children back. She maintained that she loves her children but admitted that she has a more difficult time with D. C. S., and said she believes there is jealousy between the children. She also could not fully explain fully why she did not try harder to get D. C. S. back from the Reeveses after her postpartum depression improved, and she did not really remember the circumstances that led her to find the first babysitters who D. C. S. lived with before he lived with the Reeveses.

The Guardian ad litem submitted a written report recommending termination of parental rights and also addressed the juvenile court at the hearing to put his recommendation on the record. He noted the Mother's lack of cooperation with DFCS, and he said that he believed her hostility was one of the main obstacles she needed to overcome. He noted that she maintained visitation but that it had to be

suspended due to her behavior. As to housing, he noted the lack of furniture and the need for six months of stable housing to prove it could be maintained, which was in line with the recommendation in the comprehensive child and family assessment.[10] In his view, also expressed in his written report, the children would still be dependent if they were returned to the Mother, and their lack of permanency was causing them anxiety and, for D. C. S., behavioral issues. He believed the Mother had squandered her opportunity to resolve her issues and resolve the dependency issues and was of the opinion that once D. C. S. learns he will have a permanent home with the foster parents, the behavioral issues will resolve. He testified that he believed it was in the best interest of the children to terminate the Mother's parental rights so they could be adopted by the foster parents.

A bonding and attachment assessment conducted on September 6, 2022 with the children and the foster parents was also admitted into evidence. The bonding report noted that the foster parents were aware of the children's needs, including the need for therapy and other services to help them overcome their behavior and developmental issues, and that the foster parents had ensured that those needs were

---

[10] That report also recommended that the Mother demonstrate mental health stability for a period of six months before the children were returned to her.

appropriately met. The report noted the marked improvement in both children's behavior when the Mother's visits were suspended during the summer of 2022, as well as the marked increase in negative and destructive behaviors when visitation was resumed. Based on the history and interactions the assessor observed between the children, the foster parents, and the other children in the home, the assessor concluded that both children had a "secure" attachment with the foster parents, sought affection from the foster parents as well as the other children in the home, and appeared happy and comfortable with all family members. The report concluded by recommending that DFCS "pursue termination of parental rights in order to allow the children the opportunity for adoption."

(b) *Juvenile Court's Order.* The procedure for terminating parental rights is set out in OCGA § 15-11-310, and requires a two-step process. First, under OCGA § 15-11-310 (a), the juvenile court determines whether one of the five statutory grounds for termination has been met. "These grounds are independent, and thus, on appeal, if there is sufficient evidence supporting any one of these grounds, we need not consider the other grounds in order to affirm." (Citation and punctuation omitted.) *In the Interest of C. A. B.*, 351 Ga. App. 666, 671-672 (2) (832 SE2d 645) (2019). If the

juvenile court determines one or more of the statutory grounds has been met, the court then must move on to the next step, which involves a determination of whether the termination is in the child's best interest based on consideration of factors set out in OCGA §§ 15-11-26 and 15-11-310 (b), or any other factors the court considers relevant. *In the Interest of C. A. B.*, 351 Ga. App. at 671-673 (2).

The juvenile court in this case concluded that there were at least three grounds authorizing the termination of the Mother's parental rights under OCGA § 15-11-310 (a). Citing OCGA § 15-11-310 (a) (2), the juvenile court concluded that the Mother had subjected the children to aggravated circumstances, to wit, abandonment as defined in OCGA § 15-11-2 (1); citing OCGA § 15-11-310 (a) (3), the juvenile court concluded the Mother had wantonly and willfully failed to comply with a court ordered child support decree for 12 months or longer; and, citing OCGA § 15-11-310 (a) (5), the juvenile court concluded the children were dependent due to lack of proper parental care and control by the Mother. As to this last ground, the court found, as required by the statute, that reasonable efforts to remedy the circumstances have been unsuccessful, and that, based on the abandonment of M. R. S. and termination of the Mother's parental rights to that child, her many years of homelessness, her placement

of D. C. S. in the care of others for many years of his life, her failure to support him during those years, and her failure to pay even a symbolic amount of child support as ordered by the courts, such dependency is likely to continue, will not likely be remedied and will likely cause serious physical, mental or emotional harm to the children.

2. The Mother contends that there was insufficient evidence to support termination under any of these grounds. We disagree.

(a) *OCGA § 15-11-310 (a) (3).* Regarding the juvenile court's finding under OCGA § 15-11-310 (a) (3), it is undisputed the Mother was behind in her child support payments. Still, the Mother argues that this failure should not be considered willful and wanton, as required by the statute, because the amounts owed, considered over almost a two-year period, were not significant – $242.00 for E. A. S and approximately $350.00 for D. C. S. While it is true that the arrearages were not substantial, neither was the amount the Mother was ordered to pay – initially $25.00 per month per child under the case plan and then later $25.00 per month for D. C. S. under the case plan and $50.00 per month for E. A. S. under a child support recovery order. Thus, the arrearage for D. C. S. alone counts for fourteen months of missed child support

payments. The Mother also points to her testimony about problems with her finances, including that she received workers' compensation benefits, which was less than her regular salary, for a period of time, and that she was confused about what she was supposed to pay because the obligation was initially imposed under her case plan but later there was also a separate court order. However, the Mother's confusion does not excuse her failure to pay since she had a responsibility to ensure that she was meeting her child support obligations, especially since she knew the consequences of her failure to support her children based on the multiple times she was held in contempt and ultimately lost her parental rights to her oldest child. Accordingly, clear and convincing evidence supported the juvenile court's conclusion that the termination of the Mother's parental rights was warranted under OCGA § 15-11-310 (a) (3).

(b) *OCGA § 15-11-310 (a) (5).* Although we are not required to do so, we exercise our discretion to review the Mother's challenge to the termination of her parental rights under OCGA § 15-11-310 (a) (5).[11] Given the complexity of the analysis under this section, it is helpful to set out the text of OCGA § 15-11-310 (a) (5) (A), (B) in its entirety:

---

[11] However, we decline to exercise our discretion to review the trial court's determination that termination was also warranted under OCGA § 15-11-310 (a) (2).

A child is a dependent child *due to lack of proper parental care or control* by his or her parent, reasonable efforts to remedy the circumstances have been unsuccessful or were not required, such cause of dependency is likely to continue or will not likely be remedied in the reasonably foreseeable future, and:

(A) Returning such child to his or her parents is likely to cause serious physical, mental, moral, or emotional harm to such child or threaten the physical safety or well-being of such child; *or*

(B) Continuation of the parent child relationship will cause or is likely to cause serious physical, mental, moral, or emotional harm to such child.

(Emphasis supplied.)

Thus, the first step in applying OCGA § 15-11-310 (a) (5) is to determine whether the child is a dependent child due to lack of parental care and control. OCGA § 15-11-311 sets out the circumstances the court is required to consider when making that determination. Relevant here, the court should consider whether there exists

(1) A medically verified deficiency of such child's parent's physical, mental, or emotional health that is of such duration or nature so as to render such parent unable to provide adequately for his or her child;

. . .

(5) Physical, mental, or emotional neglect of his or her child or evidence of past physical, mental, or emotional neglect by the parent of such child or another child of such parent[.][12]

OCGA § 15-11-311 (a) (1), (5). Additionally, where, as here, the child is not in the custody and care of his parent, the court is also required to consider,

without being limited to, whether such parent, without justifiable cause, has failed significantly for a period of six months prior to the date of the termination hearing:

(1) To develop and maintain a parental bond with his or her child in a meaningful, supportive manner;

(2) To provide for the care and support of his or her child as required by law or judicial decree; and

(3) To comply with a court ordered plan designed to reunite such parent with his or her child.

OCGA § 15-11-311 (b).

---

[12] Although the Mother argues that the juvenile court was not authorized to consider her failure to pay child support for M. R. S., this subsection authorized the trial court to consider her past conduct with regard to her past neglect of M. R. S.

(i) *OCGA § 15-11-311 (a).* We first turn to subsections (1) and (5) of OCGA § 15-11-311 (a), which broadly concern "[a] medically verified deficiency" of the parent and current or past neglect of a child. As the juvenile court noted in the termination order, regarding subsection (a), the Mother was diagnosed with generalized anxiety disorder, PTSD, adult sexual abuse, and adult psychological abuse, and the comprehensive child and family assessment recommended that the Mother exhibit six months of mental stability before the children were returned to her. A recommendation was made for individualized counseling but, as explained above, the Mother only completed eight sessions before DFCS terminated the counseling due to the Mother's inconsistent attendance and lack of progress. The juvenile court found the Mother suffered from "habitual instability," and this finding was supported by recent evidence, including evidence of the Mother's contentious encounter with a DFCS caseworker who came to verify her address and her irate behavior when she was stopped at a roadblock checkpoint a few months prior to that.[13]

---

[13] The juvenile court mentioned this arrest in the termination order, but the Mother argues we should not consider it because the charges were later dropped. Although we disagree with the Mother that this incident, during which the Mother was described as "irate" and said she was upset with law enforcement because they took her children, is of no relevance, it does not impact our analysis in any other significant way and the arresting officer's testimony is not recounted here.

26

Clear and convincing evidence also supported the determination that the Mother had physically abused and neglected the children immediately prior to their removal from her care, that she had failed to support D. C. S. for most of his life and left him in the care of virtual strangers and others for long periods without attempting to know his whereabouts, and that she abandoned her older child prior to the termination of her parental rights to that child.

(ii) *OCGA § 15-11-311 (b)*. We next turn to the consideration of the factors a court must look at when considering whether a child is without proper parental care and control when the child is not currently being cared for by the parent. These three factors, broadly speaking, concern the parental bond, providing support for the child, and complying with the reunification plan.

Concerning the parental bond, evidence was presented that the Mother had developed something of a bond with the children, but the therapist cast doubt on whether that bond was meaningful since it was based on limited, structured visits where the Mother's harmful behaviors toward the children could be readily observed and corrected, which they were on a number of occasions. And the foster father

reported that both children's behavior improved when they were not visiting with the Mother.

The Mother's lack of support for the children has been discussed above, and we will not belabor that point. As to the Mother's compliance with the reunification plan, the two major areas of concern that caused the children's continued dependency – the Mother's mental health issues and lack of stable housing – remained unresolved under the case plan. Although the Mother takes issue with the juvenile court's finding that she has not substantially completed the requirement that she maintain stable housing, we have little hesitancy in concluding that acquiring an apartment only three weeks before the termination hearing after years of housing insecurity and homelessness does not come close to the goal of *maintaining* stable housing. And this is especially true considering that three weeks after the lease was signed, the apartment remained virtually unfurnished and unsuitable for the children to stay there. Although the Mother maintains that she was diligently looking for housing all along, it was for the juvenile court to credit or discredit this testimony, and the court appeared to discredit the testimony by noting in the termination order that the documentation the Mother produced of her search was dated after the termination

petition was filed. *In the Interest of K. B.*, 368 Ga. App. 485, 488 (1) (890 SE2d 414) (2023).

As to the Mother's failure to address her mental health issues through individual and anger management counseling, the record is replete with evidence showing that DFCS terminated the counseling because of the Mother's lack of progress, which was attributable largely to her unwillingness or inability to participate in counseling in a productive way, instead squandering her time by expressing her anger at DFCS and life in general instead of working on the issues that would have allowed her to regain custody of her children. The Mother argues, however, that the termination of counseling should not be held against her since, due to a mistaken entry in the progress notes, she believed she had completed the counseling requirement and did not need to participate further. However, that mistake was rectified several months before the termination hearing, and, even with the threat of losing her parental rights looming over her, there is nothing to indicate that the Mother asked to resume counseling until the hearing, when she indicated she would be open to that possibility. Further, although the Mother says she was attempting to find her own counselor, the

Mother gave excuses as to why that had not happened and gave no indication when, if ever, that might be accomplished.

In sum, the evidence was sufficient to authorize the juvenile court's conclusion that the children were dependent due to the Mother's lack of care and control. Further, also as set out above, the evidence was also sufficient to show that the reasonable efforts to address the circumstances contributing to the dependency had been unsuccessful.

(iii) Turning to the next requirement under OCGA § 15-11-310 (a) (5), which broadly concerns on-going dependency, the Mother also argues that, in light of the fact that she completed or substantially completed many aspects of her case plan, including housing, there was insufficient evidence to support the juvenile court's finding that the children's dependency is likely to continue and is not likely be remedied in the reasonably foreseeable future. However, the Mother's newly acquired housing had to be considered against years of homelessness since "last minute efforts to obtain stable housing, especially those that take place after the termination petition is filed, are of questionable significance and sincerity." (Citation and punctuation omitted.) *In the Interest of R. S. T.*, 345 Ga. App. 300, 308 (1) (b) (812 SE2d 614)

30

(2018). Further, in addition to her housing issues, the juvenile court found that the Mother could not identify who would care for her children while she was at work, even though this was a circumstance that had largely contributed to the children's neglect when they came into the custody of DFCS. While the Mother said that she was hopeful she could change her shift at work and that she had several contacts for potential babysitters who may or may not still be available, the fact remains that the Mother had almost two years to accomplish those things but still had not achieved a concrete plan at the time of the termination hearing.

Likewise, the Mother's unresolved mental health issues, particularly her anger management issues, had hampered her ability to cooperate with DFCS and take advantage of the services DFCS provided to assist the Mother in achieving her case plan goals. Specifically, in recommending termination, the guardian ad litem opined that the Mother's unaddressed mental health issues were impeding her progress. Thus,

> [w]hile the record does show the [M]other's recent efforts to comply with some aspects of the case plan, what weight to give that evidence was a question for the trier of fact. Likewise, judging the credibility of her good intentions was a task for the juvenile court. Moreover, the juvenile

court was authorized to consider the [M]other's past conduct in determining whether the causes of [dependency] were likely to continue.

(Citation and punctuation omitted.) *In the Interest of L-M. C. L.*, 362 Ga. App. 520, 531 (3) (869 SE2d 161) (2022). Here, the juvenile court specifically weighed the Mother's recent progress against her past conduct including her abandonment of M. R. S., the termination of her parental rights to that child, her long history of homelessness, her placement of D. C. S. in the care of others for much of his life and her failure to support him, and her failure to meet her "symbolic" child support obligations. Further, viewing the evidence in its entirety, the court determined that the Mother would likely never be able to remedy her "habitual instability and lack of stable housing." "Juvenile courts are authorized to find that a parent's conduct over the years was a better predictor of her future conduct than a few months of partial stability[,]" (citation and punctuation omitted.) *In the Interest of R. S. T.*, 345 Ga. App. at 308 (1) (b), and the juvenile court's determination that the causes of the children's dependency were likely to continue and would not likely be remedied in the reasonably foreseeable future was supported by clear and convincing evidence.

(iv) Under the applicable version of OCGA § 15-11-310 (a) (5) enacted in 2018,[14] the juvenile court must also determine whether

> (A) Returning such child to his or her parent is likely to cause serious physical, mental, moral, or emotional harm to such child or threaten the physical safety or well being of such child; *or*

> (B) Continuation of the parent and child relationship will cause or is likely to cause serious physical, mental, moral or emotional harm to such child.

(Emphasis supplied.)

"While a finding that dependency is likely to continue does not necessarily justify a finding of harm, [it] may support a finding of harm under certain circumstances." (Citation and punctuation omitted.) *In the Interest of N. P.*, 363 Ga. App. 879, 892 (2) (872 SE2d 501) (2022). The Mother says the children still love her and they will not be harmed if she is given more time to complete her case plan so the children can be reunited with her in the "near future." However, as stated above, the juvenile court found that the "mother will likely never be able to overcome her habitual instability and lack of stable housing," meaning it was not likely that the

---

[14] See Ga. L. 2018, p. 935, § 3.

children would ever be reunited with their Mother and that, undoubtedly, they would suffer harm if they were returned to her while these issues remained unresolved.

> In determining whether continued dependency is likely to cause harm to a child, a juvenile court may consider the adverse effects of prolonged foster care and [evidence] about the need for permanency insofar as it is well established that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems.

(Citation and punctuation omitted.) Id. at 892 (2).

The evidence could not have been clearer that the lack of stability about his future was causing D. C. S. anxiety and behavior issues, which improved when he was told his Mother's parental rights might be terminated; further, D. C. S.'s overarching need for permanency to overcome the emotional damage he had already suffered due to his Mother's abandonment early in his life was likewise beyond dispute. While the evidence concerning E. A. S. was not as developed due to his young age, evidence was also presented that he "experienced an escalation in negative behaviors" once the visits with the Mother resumed after the two-month suspension during the summer of 2022. See *In the Interest of L. P.*, 339 Ga. App. 651, 657 (2) (794 SE2d 252) (2016) (concluding that evidence supported a finding that maintaining the status quo likely

would harm the children where behavioral problems dissipated when visits with parent were discontinued). The juvenile court's determination about the Mother's habitual instability and lack of stable housing places this case squarely within the line of cases in which we have recognized "that children should not be required to linger unnecessarily and indefinitely in foster case, inasmuch as children need permanence of home and emotional stability, or they are likely to suffer serious emotional problems." (Citation and punctuation omitted.) *In the Interest of C. L.*, 315 Ga. App. 607, 612 (1) (b) (727 SE2d 163) (2012). The juvenile court recognized this in making a determination of harm, and clear and convincing evidence in the record supports the juvenile court's determination.

3. *Best Interests.* Having determined that clear and convincing evidence supported the termination of the Mother's parental rights based on one or more of the statutory grounds for termination, the juvenile court moved to the next step of the analysis to determine if the termination was in the best interests of the children under OCGA § 15-11-310 (b). Although the Mother makes the blanket statement several times in her brief on appeal that the termination of her parental rights was not in the children's best interests, she did not include a supporting argument challenging this

part of the juvenile court's order. Indeed, the most she has offered to support this assertion is a statement in her conclusion that "the best interest of the children . . . are not being served by them continuing to remain in foster care while their mother has established stability and is ready and willing to take them into her custody either now or in the near future." Not only is this contention belied by the record, as explained exhaustively above, but it also fails to make reference to the relevant factors the juvenile court properly considered in making this determination as required by OCGA § 15-11-310 (b). Thus, we consider any challenge to this part of the juvenile court's order to have been abandoned by the Mother. See Court of Appeals Rule 25 (d) (1). We have, however, independently reviewed the record in light of the factors set out in OCGA § 15-11-310 (b) and OCGA § 15-11-26, and conclude that sufficient evidence was presented to support the juvenile court's determination that termination of the Mother's parental rights was in the children's best interests. Accordingly, the juvenile court's order terminating the Mother's parental rights to D. C. S. and E. A. S. is affirmed.

*Judgment affirmed. Rickman, J., concurs. Dillard, P. J., concurs specially.*

A23A1492. IN THE INTEREST OF D. C. S., et al., CHILDREN (MOTHER).

DILLARD, Presiding Judge, concurring specially.

I concur in the majority's decision to affirm the juvenile court's termination of the mother's parental rights, but I do so based solely on her abandonment of the

children under OCGA § 15-11-310 (a) (4).[1] My analysis necessarily begins by noting that the deferential standard of review in parental-rights cases must be

> tempered by the fact that there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously. The right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances.[2]

Tragically, such circumstances are present here.

As this Court has previously explained, OCGA § 15-11-310 (a) (4) provides that "[i]n considering the termination of parental rights, the court shall first determine

---

[1] While the juvenile court did not expressly address abandonment *under OCGA § 15-11-310 (a) (4)* as an independent basis for terminating the mother's parental rights, it did find evidence establishing that abandonment was an "aggravated circumstance" for terminating her rights under *OCGA § 15-11-310 (a) (2).* And in doing so, the court referenced the applicable statutory definition of abandonment in OCGA § 15-11-2 (1). The majority declines to address the juvenile court's abandonment ruling in this respect; but as it rightly acknowledges, "if there is sufficient evidence supporting any *one* of the grounds [identified in OCGA § 15-11-310 (a)], we need not consider the other grounds in order to affirm." *In the Interest of C. A. B.*, 351 Ga. App. 666, 671-72 (2) (832 SE2d 645) (2019) (emphasis supplied).

[2] *In the Interest of C. S.*, 354 Ga. App. 133, 136 (840 SE2d 475) (2020) (punctuation omitted); *accord In the Interest of E. G. L. B.*, 342 Ga. App. 839, 840 (805 SE2d 285) (2017).

whether one of the statutory grounds for termination of parental rights has been met, and one of those grounds is when a child is abandoned by his or her parent.”[3]

Importantly. abandonment is statutorily defined as

> any conduct on the part of a parent, guardian, or legal custodian showing an intent to forgo parental duties or relinquish parental claims. Intent to forgo parental duties or relinquish parental claims may be evidenced by:
>
> (A) Failure, for a period of at least six months, to communicate meaningfully with a child;
>
> (B) Failure, for a period of at least six months, to maintain regular visitation with a child;
>
> (C) Leaving a child with another person without provision for his or her support for a period of at least six months;
>
> (D) Failure, for a period of at least six months, to participate in any court ordered plan or program designed to reunite a child's parent, guardian, or legal custodian with his or her child; . . .

---

[3] *In the Interest of C. S.*, 354 Ga. App. at 136 (punctuation omitted); *see* OCGA § 15-11-310 (a) (4) (“In considering the termination of parental rights, the court shall first determine whether one of the following statutory grounds for termination of parental rights has been met . . . [a] child is abandoned by his or her parent.”); *In the Interest of M. M. D.*, 356 Ga. App. 653, 657 (3) (848 SE2d 687) (2020) (“Abandonment is an independent ground authorizing termination, and “if there is sufficient evidence supporting any one of the statutory grounds, we need not consider the other grounds . . . in order to affirm.” (punctuation omitted)).

(F) Being absent from the home of his or her child for a period of time that creates a substantial risk of serious harm to a child left in the home; *or . . .*

(H) Any other conduct indicating an intent to forgo parental duties or relinquish parental claims.[4]

Here, setting aside the lengthy details of the mother's various efforts and failures over many years in attempting to care for or even maintain contact with her young children, it is undisputed that she legally abandoned them long before the instant proceedings commenced;[5] and the juvenile court's ruling should be upheld for this reason alone. Even so, we should never reach such a conclusion lightly. Indeed, in every parental-rights case, we must be ever mindful of the long-standing, fundamental principle that "[p]arents have a constitutional right under the United States and Georgia Constitutions to the care and custody of their children."[6] As our

---

[4] OCGA § 15-11-2 (1) (A)-(H) (emphasis supplied).

[5] *See, e.g.,* Majority Op., p. 29 ("Clear and convincing evidence also supported the determination that the Mother had physically abused and neglected the children immediately prior to their removal from her care, that she had failed to support D. C. S. for most of his life and left him in the care of virtual strangers and others for long periods without attempting to know his whereabouts, and the she abandoned her older child prior to the termination of her parental rights to that child.").

[6] *Borgers v. Borgers*, 347 Ga. App. 640, 646 (820 SE2d 474) (2018) (Dillard, J., concurring specially) (quoting *Clark v. Wade*, 273 Ga. 587, 596 (IV) (544 SE2d 99) (2001) (plurality opinion)); *see Brooks v. Parkerson*, 265 Ga. 189, 191 (2) (a) (454 SE2d

Supreme Court has rightly emphasized, "there can scarcely be imagined a more fundamental . . . right than the right of a natural parent to [his or her] offspring."[7] And the fundamental liberty interest of natural parents in "the care, custody, and management of their child does not evaporate simply because they have not been model parents. . . ."[8] But here, the overwhelming evidence establishes far more than the mere failure of the mother to be a model parent—she showed little, if any, interest

769) (1995) ("The U.S. Supreme Court has long recognized a constitutionally protected interest of parents to raise their children without undue state interference."); *In the Interest of M. F.*, 298 Ga. 138, 144-45 (2) (780 SE2d 291) (2015) ("The presumption that children ordinarily belong in the care and custody of their parents is not merely a presumption of the statutory and common law, but it has roots in the fundamental constitutional rights of parents. The Constitution secures the fundamental right of parents to direct the upbringing of their children, and it protects a private realm of family life which the state cannot enter without compelling justification." (punctuation and citation omitted)).

[7] *In the Interest of M. F.*, 298 Ga. at 145 (2) (punctuation omitted); *accord Floyd v. Gibson*, 337 Ga. App. 474, 479 (1) (788 SE2d 84) (2016).

[8] *In the Interest of M. F.*, 298 Ga. at 145 (2); *accord Santosky v. Kramer*, 455 U.S. 745, 753 (II) (102 SCt 1388, 71 LE2d 599) (1982); *see In the Interest of C. J. V.*, 323 Ga. App. 283, 289 (746 SE2d 783) (2013) (Dillard, J., concurring fully and specially) ("[T]he overarching question in a termination proceeding is not whether the child has a model parent, or even whether that parent is presently capable of taking his or her child back into custody, but is instead whether the natural parent-child relationship has been *irretrievably* damaged as a result of the parent's unwillingness or inability to care for the child—i.e., that the continuation of the natural parent-child relationship, as it *presently* exists with the child in the custody of the State, is causing or is likely to cause that child serious harm." (punctuation omitted)).

in parenting her children at all.[9] As a result, I have no qualms in concluding the

---

[9] Suffice it to say, I do not agree the mother's lack of "stable housing," poverty, mental-health issues (standing alone), or hostility to caseworkers in any way justifies terminating her parental rights. *See, e.g., In the Interest of C. J. V.*, 323 Ga. App. 283, 289 (746 SE2d 783) (2013) (Dillard, J., concurring fully and specially) ("It is the height of irony that Georgia, a state founded for the purpose of providing a fresh start for those whose 'misfortunes and want of Employment . . . are not able to provide a maintenance for themselves and Families' now has an institutionalized policy of severing the natural parent-child relationships of its poorest and most vulnerable citizens simply because they are unable to keep up with the Joneses. Some may call this progress. I do not. And, in any event, I do not think such a policy is even remotely constitutional. The United States and Georgia Constitutions require that the State must proffer compelling facts before terminating and, thus, permanently extinguishing, parental rights.") (citation omitted). Nor is the government at liberty to terminate parental rights simply because a parent fails to successfully complete a case plan or program. *See, e.g., In the Interest of E. G.*, 315 Ga. App. 35, 47 (726 SE2d 510) (2012) (Dillard, J., concurring fully and specially) ("I also disagree with the majority's suggestion that a natural parent's rights can be terminated merely because the father failed to satisfy certain elements of the State's reunification plan . . . ."). It may be that, in some cases, a parent's failure or inability to comply with such government mandates may justify a child (or children) remaining in the custody of the state; but it may not serve as a basis for the termination of parental rights. *Id.* To the extent the majority suggests otherwise, it errs in doing so. *See, e.g., In Interest of R. S. T.*, 345 Ga. App. 300, 316 (812 SE2d 614) (2018) (Dillard, J., concurring fully and specially) (noting that "[s]ignificantly, the termination of one's parental rights cannot be equated to an individual who faces an interruption of custody because termination is a much more severe measure that acts to address the most exceptional situation of a deprived child and that child's continuing deprivation. And there is a reason for this crucial distinction: Terminating a parent's rights, and thus forever foreclosing the possibility of restoring the natural parent-child relationship, is governmental extinguishment of the parent and child's constitutional right to familial relations.") (cleaned up).

juvenile court correctly terminated her parental rights.